**1232**

UNITED STATES TELEPHONE
ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

National Telephone Cooperative Associa-
tion; National Association of Broad-
casters; Mobile Marine Radio, Inc.; Tel-
ocator; US West Communications, Inc.;
National Association for the Advance-
ment of Colored People; National Black
Media Coalition; Office of Communica-
tion of the United Church of Christ; the
League of United Latin American Citi-
zens, Invervenors,

UNITED STATES TELEPHONE
ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

US West Communications,
Inc., Intervenor.

Nos. 92–1321, 93–1526.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 25, 1994.

Decided July 12, 1994.

John Gibson Mullan, Washington, DC, ar-
gued the cause for petitioner. With him on
the briefs were Mitchell F. Hertz, Martin T.
McCue, and Linda L. Kent, Washington, DC.
Alfred W. Whittaker, Washington, DC, en-
tered an appearance.

Laurel R. Bergold, Counsel, F.C.C., Wash-
ington, DC, argued the cause for respon-
dents. With her on the brief were Daniel M.
Armstrong, Associate General Counsel,
F.C.C., John E. Ingle, Deputy Associate
General Counsel, F.C.C., Anne K. Bingaman,
Asst. Atty. Gen., and Robert B. Nicholson
and Robert J. Wiggers, Attys., U.S. Dept. of
Justice, Washington, DC. James M. Carr,
Counsel, F.C.C., Washington, DC, entered an
appearance.

On the brief for intervenors Civil Rights
Organizations were Dennis Courtland Hayes,
General Counsel, National Ass'n for the Ad-
vancement of Colored People, Baltimore,
MD, Everald Thompson, Associated General
Counsel, National Ass'n, for the Advance-
ment of Colored People, Columbia, MD, and
David Honig, Miami, FL.

David Cosson and L. Marie Guillory,
Washington, DC, entered an appearance for
intervenor National Telephone Co-op. Ass'n.

Henry L. Baumann and Barry D. Uman-
sky, Washington, DC, entered an appearance

for intervenor National Ass'n of Broadcasters.

Martin W. Bercovici, Washington, DC, entered an appearance for intervenor Mobile Marine Radio, Inc.

Ray M. Senkowski, Washington, DC, entered an appearance for intervenor Telocator.

Robert B. McKenna, Jr., Denver, CO, entered an appearance for intervenor US West Communications, Inc.

Before: WALD, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Commission issued, without notice and comment, a schedule of base penalties and adjustments to determine the appropriate fines for violations of the Communications Act. We conclude that the penalty schedule is not a policy statement and, therefore, should have been put out for comment under the Administrative Procedure Act.

## I.

Section 503(b) of the Communications Act authorizes the FCC to impose "monetary forfeitures" (fines) on licensees for violations of the Act or of regulations promulgated thereunder, taking into account "the nature, circumstances, extent and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(D) (1988). The statute provides a maximum fine schedule in accordance with classification of licensee: $25,000 for broadcasters and cable television operators, $100,-000 for common carriers (such as telephone companies), and $10,000 for other service providers. For each day of a continuing violation, the Commission may assess up to $250,000 for broadcasters, $1,000,000 for common carriers, and $75,000 for others. 47 U.S.C.A. § 503(b)(2) (West 1991).

The FCC decided in 1991 to abandon its traditional case-by-case approach to implementing section 503(b) and issued an order to "adopt more specific standards for assessing forfeitures." *Standards for Assessing Forfeitures,* 6 F.C.C.R. 4695 (1991), *recon. denied* 7 F.C.C.R. 5339 (1992), *revised,* 8 F.C.C.R. 6215 (1993). The forfeiture standards, set forth in a schedule appended to its order, contemplate a base forfeiture amount for each type of violation, which amount is calculated as a percentage (varying on the violation) of the statutory maxima for the different services. Thus, the base forfeiture amount for false distress communications is 80% of the statutory maxima: *i.e.,* $20,000 per violation for broadcasters, $80,000 for common carriers, and $8,000 for others. The FCC asserted that setting the base amounts as a percentage of the maximum fines permitted by Congress for each category of licensee best furthered the goals of the statute. *See* 6 F.C.C.R. at 4695. The fines schedule also provides for adjustments to the base amount depending on various aggravating or mitigating factors. The base amount, for instance, is increased 20–50% for "substantial economic gain" and reduced 30–60% for "good faith or voluntary disclosure."

Petitioner, a trade group of telephone companies that unsuccessfully sought reconsideration before the agency, mounts a double-barreled challenge to the forfeiture standards. It claims that the Commission violated the Administrative Procedure Act by issuing the standards without notice and an opportunity to comment. Petitioner also contests the substantive validity of the prescribed base forfeiture amounts, asserting that FCC's percentage-of-maxima approach arbitrarily discriminates against common carriers by subjecting them to greater fines than other licensees for the exact same conduct.

## II.

Petitioner's second question, whether the FCC is authorized to base its schedule of fines for different classes of licensees by tracking the statutory maxima for those classes, strikes us as quite difficult. We need not, however, answer that question

since we agree with petitioner that the FCC was obliged, under the APA, to put the forfeiture standards out for comment. Obviously, if the standards are subject to notice and comment, it would be premature to determine if they are reasonable and authorized by the statute.[1] The Commission may not wish to issue them as a legislative rule, or, even if it does, the standards may change in light of public comments.

The Commission claims that the standards are only general statements of policy exempt from the notice and comment obligation that the APA imposes on the adoption of substantive rules.[2] *See* 5 U.S.C. § 553(b)(3)(A). The distinction between the two types of agency pronouncements has not proved an easy one to draw, *see, e.g., Community Nutrition Institute v. Young,* 818 F.2d 943, 946 (D.C.Cir.1987), but we have said repeatedly that it turns on an agency's intention to bind itself to a particular legal policy position. *Public Citizen, Inc. v. United States Nuclear Regulatory Comm'n,* 940 F.2d 679, 681–82 (D.C.Cir.1991) (quoting *Vietnam Veterans v. Secretary of the Navy,* 843 F.2d 528, 538 (D.C.Cir.1988)). The Commission, mindful of this precedent, labeled the standards as a policy statement and reiterated 12 times that it retained discretion to depart from the standards in specific applications.

The difficulty we see in the Commission's position is that the appendix affixed to the short "policy statement" sets forth a detailed schedule of penalties applicable to specific infractions as well as the appropriate adjustments for particular situations. It is rather hard to imagine an agency wishing to publish such an exhaustive framework for sanctions if it did not intend to use that framework to cabin its discretion. Indeed, no agency to our knowledge has ever claimed that such a schedule of fines was a policy statement. It simply does not fit the paradigm of a policy statement, namely, an indication of an agen-

cy's current position on a particular regulatory issue.

Although sometimes we face the difficulty of reviewing a statement before it has been applied and therefore are unsure whether the agency intends to be bound,[3] that is not so in this case. The schedule of fines has been employed in over 300 cases and only in 8 does the Commission even claim that it departed from the schedule. In three cases, the Commission maintains that it did not apply the guidelines at all to certain violations of a new tariff-filing requirement. That, however, is a mischaracterization. The Commission initially issued Notices of Apparent Liability, calculating the amounts exactly as prescribed by the forfeiture standards. *See Call West,* 6 F.C.C.R. 6941 (1991); *National Tele–Sav, Inc.,* 6 F.C.C.R. 6947 (1991); *S.I./C–T Coin Telephone, Inc.,* 6 F.C.C.R. 6953 (1991). After the parties filed responses, the Commission reconsidered and ordered the initial notices to be cancelled because it believed that "there appears to have been some confusion surrounding the new tariff filing requirements." *Call West,* 7 F.C.C.R. 4430 (1992); *National Tele–Sav, Inc.,* 7 F.C.C.R. 4427 (1992); *S.I./C–T Coin Telephone, Inc.,* 7 F.C.C.R. 4424 (1992). The most that could be said about these cases is that the Commission exercised enforcement discretion *not to prosecute*—but adhered to the standards when it calculated the penalties that would have applied had it prosecuted.

In *Cargo Vessel Kodiak Enterprise,* 7 F.C.C.R. 1847 (1992), the Commission ordered a forfeiture of $50,000 where strict application of the standards would have amounted to $155,000. The reason given, however, was that "[w]hen an inspection certificate expires while a vessel is at sea, our policy is not to assess a forfeiture for the period between the expiration of the certifi-

---

1. We likewise do not reach the argument made by various civil rights organizations who intervened that the Commission had failed to explain why the fines for violations of equal employment regulations were not greater.

2. The Commission also raises ostensible jurisdictional arguments, standing and ripeness, which really turn on the same question—whether the

statement is binding. As such, they are circular and not worth separate consideration as jurisdictional arguments.

3. In *Public Citizen,* 940 F.2d at 683–84, we held a policy statement unripe for judicial review where the statement's language was equivocal and the policy had not been actually applied.

cate and the vessel's arrival in port." 7 F.C.C.R. at 1848. The deviation thus resulted not from relaxation of the standards but again from a non-prosecution policy independent of the standards—that under certain conditions no fines at all, however they are calculated, will attach. In three other cases, the Commission applied the base amounts under the forfeiture standards but did not insist on upward adjustments. *See Dial-A-Page, Inc.,* 8 F.C.C.R. 2767, 2768 (1993) (potential increase for "repeated violations"); *TVX Broadcast Group,* 6 F.C.C.R. 7494, 7496 (1991) (same); *David Price,* 7 F.C.C.R. 6550, 6551 n. 4 (1992) ("lengthy continuous violation"). That the Commission deviated from a minor portion of the standards, while probative, does not vitiate its adherence to the schedule of base amounts.

The Commission is left to rely on a single opinion, *James Scott Martin,* 7 F.C.C.R. 3524 (1992), in which it noted that under the standards, the base forfeiture amount would have been $8000. "Under the circumstances of this case," however, the Commission imposed a fine of $1000. *Id.* The decision admittedly is ambiguous as to whether the Commission applied downward adjustment criteria under the standards (which, petitioner contends, could yield a $1000 bottom line) or exercised independent discretion in reaching that amount. But even if we resolved the ambiguity in the Commission's favor, that would mean that the Commission exercised discretion in only one out of over 300 cases, which is little support for the Commission's assertion that it intended not to be bound by the forfeiture standards. *Cf. McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1321 (D.C.Cir.1988).

If there were any doubt as to the nature of the standards—and we do not think there is—the Commission's own Common Carrier Bureau in *David L. Hollingsworth,* 7 F.C.C.R. 6640 (Com.Car.Bur.1992) supported petitioner's argument by refusing to consider a claim that the fine set forth in the schedule was inequitable as applied to a particular respondent. The Bureau responded to this challenge to the substance of the policy state-

ment by asserting that the argument "should have been raised in a petition by [respondent] for reconsideration of the Policy Statement." *Id.* That certainly indicates that the Bureau thought the "Policy Statement" was a rule in masquerade. For "[w]hen the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." *Pacific Gas & Elec. Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir. 1974). Otherwise, a party would not be able to challenge the policy either when issued as a statement or when applied in an individual case. *See McLouth,* 838 F.2d at 1321; *Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.,* 822 F.2d 1105, 1110 (D.C.Cir.1987). Indeed, the Commission rejected petitioner USTA's petition for reconsideration of the standards:

> In light of the fact that the *Policy Statement* simply provides some general guidance that may be used in particular cases, we believe such concerns are more appropriately addressed in the context of specific cases. Accordingly, we will not address such implementation matters here.

7 F.C.C.R. at 5340. It seems that the Commissioner has sought to accomplish the agency hat trick—avoid defense of its policy at any stage. To be sure, the Commission disavows the Bureau's opinion, suggesting that if review to the full Commission had been sought, *Hollingsworth* would have been decided somewhat differently.[4] But the Bureau's decision is certainly a powerful indication that the Commission's own staff thought the schedule of fines was intended to bind, no matter what "policy statement" clothing it wore.

The Commission appears to wish to avoid grappling with the issue which we noted at the outset is quite vexing—whether the disparate treatment of different classes of licensees in the forfeiture schedule is reasonable and authorized under the statute. Neither in a direct challenge to the policy nor in an individual enforcement proceeding, according to the Commission, would common carriers be entitled to claim that their treatment vis-

---

4. We note, however, that regulations permit the Commission, on its own motion, to review and reverse decisions made with delegated authority. 47 C.F.R. § 1.117 (1993).

a-vis broadcasters or other licensees is arbitrary. Not in the former because the policy statement is supposedly not binding, and not in the latter because the conceptual framework for the schedule of fines—at least the comparison between the base levels for different classes of licensees—is somehow not germane in an individual case. That simply will not do. The FCC cannot determine that common carriers as a class will pay heavier fines than other licensees and not explain their reasons for that position or subject that explanation to judicial review. The Commission will, thus, have to put its proposed position out for comment and be prepared to justify whatever rule it fashions to the public and, if necessary, to the judiciary.

\* \* \* \* \* \*

Accordingly, we grant the petition for review and set aside the forfeiture standards.

*So ordered.*